UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TUNG NHU NGUYEN,

                                        Plaintiff,

          -v-

DEPARTMENT OF CORRECTIONS AND
COMMUNITY SERVICES, et al.,

                                        Defendants.

Case No. 13-CV-7285 (KMK)

OPINION & ORDER

<u>Appearances</u>:

Tung Nhu Nguyen
Wingdale, NY
*Pro se Plaintiff*

Adam J. Sansolo, Esq.
Owen T. Conroy, Esq.
Office of the Attorney General of the State of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Tung Nhu Nguyen ("Plaintiff"), proceeding pro se, brings this Action against

New York State Department of Corrections and Community Service ("DOCCS") and Fishkill

Correctional Facility ("Fishkill") (collectively, "Defendants"), alleging race discrimination in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

(Dkt. No. 1.)  Before the Court is Defendants' Motion for Summary Judgment ("Motion").  (Dkt.

No. 42.)  For the reasons explained herein, Defendants' Motion is granted.

I. Background

A. Factual Background

1. The Parties

DOCCS is a New York State agency that operates correctional facilities and community service programs throughout the state.  (Defs.' Rule 56.1 Statement ("Defs.' 56.1") ¶ 5 (Dkt. No. 49); Decl. of Noelia Moon ("Moon Decl.") ¶ 2 (Dkt. No. 47); Decl. of Amy A. Tousignant ("Tousignant Decl.") ¶ 4 (Dkt. No. 45).)[1]  Inmates in DOCCS custody have access to medical,

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same).

Here, Defendants filed and served their statement pursuant to Rule 56.1, (Dkt. No. 49), and filed and served a statement notifying Plaintiff as to the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 50).  Despite this notice, Plaintiff failed to submit a response, and, quite the reverse, expressly states in his opposition papers that "he agreed" with Defendants' statement of facts.  (Pl.'s Affirm. in Opp'n to Mot. ("Pl.'s Opp'n") 2 (Dkt. No 52).)  Accordingly, the Court could conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible.  *See* Local R. 56.1(c) (instructing that where a paragraph is not specifically controverted by the opposing party, it "will be deemed to be admitted for purposes of the motion"); *accord Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").  Nevertheless, in his opposition papers, Plaintiff makes several statements about the facts of this case and appends numerous documents for the Court's consideration.  (Dkt. Nos. 51–56.)  Recognizing that pro se litigants are entitled to "special solicitude . . . when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court considers these statements and documents to determine if there are any material issues of fact based on the evidence in the record, *see Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to

dental, and mental health services.  In certain facilities across the state, DOCCS operates Regional Medical Units ("RMU") for inmates with chronic or terminal illnesses.  (Defs.' 56.1 ¶ 7; Tousignant Decl. ¶ 5.)

Fishkill is a medium-security correctional facility operated by DOCCS.  (Defs.' 56.1 ¶ 8; Moon Decl. ¶ 2; Tousignant Decl. ¶ 7; Moon Decl. Ex. A (Directive No. 0051).)  Fishkill provides routine medical care and also contains a maximum-security RMU, which has a unit for the cognitively impaired as well as a long-term care unit for inmates with complex medical needs or who need partial or complete assistance with the activities of daily living.  (Defs.' 56.1 ¶¶ 9–10; Tousignant Decl. ¶ 7; Moon Decl. ¶ 2.)

Plaintiff became a Registered Professional Nurse in the State of New York in 1989 and has worked for DOCCS since 1996.  (Defs.' 56.1 ¶¶ 11–12; Decl. of Katherine B. Dirks, Esq. Ex B. (Deposition Tr. of Plaintiff ("Pl.'s Dep.")) 11:18–20, 13:15–20 (Dkt. No. 44).)  Plaintiff was employed at Downstate Correctional Facility ("Downstate") from 1996 to 2004.  (Defs.' 56.1 ¶ 13; Pl.'s Dep. 14:24–15:3.)  Between 2002 and 2004, in addition to his full-time work at Downstate, Plaintiff also provided "extra services" at Fishkill, one to two days a week.  (Defs.' 56.1 ¶ 13; Pl.'s Dep. 15:25–16:6.)  In 2004, Plaintiff transferred to Fishkill to serve in a full-time position as Nurse 2.  (Defs.' 56.1 ¶ 14; Pl.'s Dep. 16:7–10.)  In 2006, Plaintiff transferred back to Downstate for full-time service, where he continues to hold the position of Nurse 2.  (Defs.' 56.1 ¶ 15; Pl.'s Dep. 17:5–9, 107:10–11.)

---

consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and internal quotation marks omitted)); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that, where the plaintiff failed to submit a Rule 56.1 response, "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled").  For ease of reference, the Court cites to Defendants' Rule 56.1 Statement when the facts are not in dispute.

3

2.  Hiring Procedures at Fishkill

Gail Bauer ("Bauer"), Head Clerk Personnel at Fishkill, directs the recruitment and hiring process for applicants seeking employment at the facility.  (Defs.' 56.1 ¶ 18; Decl. of Gail Bauer ("Bauer Decl.") ¶ 3 (Dkt. No. 48).)  Before commencing the process to fill a vacancy, Fishkill must obtain approval from DOCCS, and it is Bauer who communicates with DOCCS's central office to request approval to proceed.  (Defs.' 56.1 ¶ 19; Bauer Decl. ¶ 4.)  Once Fishkill receives that authorization, Bauer requests from the List Unit in DOCCS's central office the civil service list for the open position.  The List Unit, in turn, sends her the names of all qualified candidates for the particular position.  (Defs.' 56.1 ¶ 20; Bauer Decl. ¶ 5.)

Either the List Unit or Fishkill's personnel office then drafts and prepares letters for Bauer to distribute via first-class mail to the individuals on the civil service list for the open position ("canvassing letters").  The canvassing letters identify information about the vacancy and ask candidates to respond within 15 days, stating whether they are interested in the open position.  (Defs.' 56.1 ¶ 21; Bauer Decl. ¶ 6.)  After receiving the responses to the canvassing letters, Bauer compiles the list of individuals who have expressed an interest in the open position and then helps to coordinate the applicant interviews.  DOCCS recruitment rules require that if five or more individuals express interest in a position, then at least five individuals must be interviewed.  (Defs.' 56.1 ¶ 22; Bauer Decl. ¶ 7.)  As of October 10, 2012, DOCCS did not require that interviews for vacant positions be conducted by three or more individuals, that all individuals participate in the same interviews, or that a facility's Deputy Superintendent of Health participate in all interviews for vacant nursing positions.  (Defs.' 56.1 ¶ 23; Bauer Decl. ¶ 12; Decl. of Paula Butler ("Butler Decl.") ¶ 11; Moon Decl. ¶ 9; Tousignant Decl. ¶ 17.)  The New York State Department of Civil Service's manual, "How to Conduct a Job Interview," does

not identify, describe, or recommend such procedures.  (Defs.' 56.1 ¶ 24; Bauer Decl. ¶ 12; *see generally id.* Ex. A (New York State Department of Civil Service, "How to Conduct a Job Interview").)

After conducting interviews of the applicants, the administrators involved in the selection process notify Bauer of their hiring preferences for the open position.  Bauer then confirms that the selection complies with New York State civil service rules regarding the selected candidate's performance on the civil service exam.  (Defs.' 56.1 ¶ 25; Bauer Decl. ¶ 8; N.Y. Civ. Service L. § 61(1); 4 NYCRR § 4.2(a).)  For certain civil service positions, candidates must take a written exam and are awarded a score from 70 to 100, with any score below 70 signifying a failing score. The New York State civil service rules require the selected candidate to have one of the top three scores among applicants for the position, except where all of the three highest-scoring applicants refuse the position.  Applicants with scores below those of the three highest-scoring applicants are not "reachable" for that position, meaning that they cannot be selected so long as one of the top three scorers has accepted the position.  (Defs.' 56.1 ¶ 26; Bauer Decl. ¶ 8.)

Once she confirms that the selected candidate is reachable for the open position, Bauer communicates the selection to DOCCS's Diversity Management Office for approval.  The Diversity Management Office is responsible for the implementation and monitoring of DOCCS's affirmative action program, which includes equal employment opportunity and investigation of discrimination complaints.[2]  The Diversity Management Office sometimes requests additional

---

[2] Of note, DOCCS does not track the racial make-up of its employees and does not require its employees to identify their race or national origin.  Some employees choose to provide information about their race or national origin but otherwise are not asked or required to provide such information.  (Defs.' 56.1 ¶¶ 84–85; Bauer Decl. ¶ 30.)

information regarding the reasons for a selection, which Bauer collects from the interviewers and conveys back to the Diversity Management Office.  (Defs.' 56.1 ¶ 27; Bauer Decl. ¶ 9.)

With the requisite approval from the Diversity Management Office, Bauer compiles the elements of the hiring packet, which may include DOCCS's central office's approval to proceed with the hiring process, the posting for the vacancy, the selected candidate's application form, and the Diversity Management Office's approval.  Bauer then sends the hiring packet to the central office for final approval of the hiring decision.  (Defs.' 56.1 ¶ 28; Bauer Decl. ¶ 10.) Upon final approval by DOCCS, Bauer contacts the selected candidate with the offer and, once he or she begins employment, notifies the other applicants that the position has been filled. (Defs.' 56.1 ¶ 29; Bauer Decl. ¶ 11.)

### 3.  Hiring Process for the Nurse Administrator 1 Position at Fishkill

In summer 2012, Fishkill had vacancies in the Nurse Administrator 1 position for both the day and night shifts.  (Defs.' 56.1 ¶ 30; Bauer Decl. ¶ 13.)  The Nurse Administrator 1 position signifies a promotion from the Nurse 2 position, with additional responsibilities (including supervision of Nurse 2 staff, coordination of the nursing schedule, and allocation of available resources) and greater compensation.  (Defs.' 56.1 ¶¶ 31–32; Bauer Decl. ¶ 13; Moon Decl. ¶ 5; Tousignant Decl. ¶ 11.)

On July 11, 2012, Bauer communicated with DOCCS's central office to request approval to proceed with the hiring process for the vacant Nurse Administrator 1 positions.  The following day Fishkill received authorization to proceed with hiring for the night shift.  On August 9, 2012, Fishkill received authorization to proceed with hiring for the day shift.  (Defs.' 56.1 ¶ 33; Bauer Decl. ¶ 15.)  In response to a request from Bauer, the List Unit provided the names of all the qualified candidates for the Nurse Administrator 1 position as well as canvassing letters.  (Defs.'

56.1 ¶ 34; Bauer Decl. ¶ 16.)  Bauer sent out the canvassing letters by first-class mail to the individuals on the Nurse Administrator civil service list, identifying Fishkill's open positions and the deadline for responding to the letter.  (Defs.' 56.1 ¶ 35; Bauer Decl. ¶ 17.)

After receiving fifteen responses indicating interest in the day shift and eight responses indicating interest in the night shift, (Defs.' 56.1 ¶ 36; Bauer Decl. ¶ 18), Bauer contacted these candidates to set up interviews at Fishkill, (Defs.' 56.1 ¶ 37; Bauer Decl. ¶ 19).  In total, eight individuals were interviewed for the day shift, and six individuals were interviewed for the night shift.  (Defs.' 56.1 ¶ 38; Bauer Decl. ¶ 19.)  Plaintiff was included in both interview groups, as his response to the canvassing letter had indicated an interest in both the day and night shifts. (Defs.' 56.1 ¶ 39; Bauer Decl. ¶ 19.)

Most of the applicant interviews, including Plaintiff's, were conducted at Fishkill on October 10, 2012 ("October 10").  (Defs.' 56.1 ¶¶ 40–41; Bauer Decl. ¶ 20.)  Of these, four interviewees had expressed an interest in the night shift.  (Defs.' 56.1 ¶ 41; Bauer Decl. ¶ 21.) Three adminsitrators arranged to participate in the interviews on October 10:  Fishkill's Deputy Superintendent of Health Paula Butler ("Butler"), Fishkill's Director of Nursing Noelia Moon ("Moon"), and New York State Director of Correctional Nursing Services Amy Tousignant ("Tousignant") (collectively, "the selection committee").  (Defs.' 56.1 ¶ 40; Bauer Decl. ¶ 20.)

The selection committee used the same set of questions for all interviewees, taking notes on a separate form for each candidate.  (Defs.' 56.1 ¶ 42; Butler Decl. ¶ 9; Moon Decl. ¶ 7; Tousignant Decl. ¶ 15.)  Though all three administrators had planned to participate in all the October 10 interviews, at some point Butler was called out of the interview room in order to attend to an urgent facility matter.  (Defs.' 56.1 ¶ 43; Butler Decl. ¶ 10; Moon Decl. ¶ 8;

Tousignant Decl. ¶ 16.)  As a result, she was not present during Plaintiff's interview, though he was not aware of the reason.  (Defs.' 56.1 ¶ 44; Pl.'s Dep. 130:23–131:14.)

During the interview, Plaintiff, in response to a question about special skills, volunteered that he spoke Vietnamese.  (Defs.' 56.1 ¶ 47; Tousignant Decl. ¶ 18; Moon Decl. Ex. B (Interview Form (Oct. 10, 2012)).)  Plaintiff was also asked whether he had any hobbies or interests, to which he responded that he was a very good cook.  (Defs.' 56.1 ¶ 48; Tousignant Decl. ¶ 19.)  After Plaintiff then described the type of food that he enjoys cooking, Tousignant stated that she had never had Vietnamese food but that it sounded good.  (Defs.' 56.1 ¶ 49; Tousignant Decl. ¶ 19.)[3]  None of the interviewers asked Plaintiff what languages he spoke, where he attended school, or where he was from.  (Defs.' 56.1 ¶ 51; Moon Decl. ¶ 11; Tousignant Decl. ¶ 20.)  Nor did the selection committee ask Plaintiff any questions about his race, ethnicity, or national origin.  (Defs.' 56.1 ¶ 52; Moon Decl. ¶ 11; Tousignant Decl. ¶ 20.)[4]

Because only four individuals had been interviewed for the night-shift vacancy on October 10, two additional interviews were conducted on October 31, 2012 and November 2, 2012, so as to comply with DOCCS recruitment rules.  (Defs.' 56.1 ¶¶ 53–54; Bauer Decl. ¶ 22.)  Neither of those candidates was reachable for the night-shift vacancy of the Nurse Administrator 1 position.  (Defs.' 56.1 ¶ 55; Bauer Decl. ¶ 22.)

---

[3] Plaintiff has indicated that he does not recall how the topics of Vietnamese language and Vietnamese food came up, who first mentioned these topics, or what was specifically said. (Defs.' 56.1 ¶ 46; Pl.'s Dep. 32:5–9, 33:3–16, 34:5–7, 34:25–35:6, 36:6–9, 36:17–23, 38:1–3, 39:15–17, 43:12–24, 44:2–8.)

[4] Though Plaintiff had not claimed that any of the interviewers made any other references to his race or national origin during the interview, (Defs.' 56.1 ¶ 50; Pl.'s Dep. 39:15–17, 44:2–8), he subsequently contradicts himself on this point, (*see* Aff. of Pl. ("Pl.'s Aff.") ¶ 9 (Dkt. No. 51); Pl.'s Opp'n 3).  As discussed below, (*see supra* n.10), the Court need not heed the later inconsistent statements.

8

4.  Hiring Decisions for the Nurse Administrator 1 Position at Fishkill

After the interviews on October 10, Butler, Moon, and Tousignant deliberated about the candidates for the open Nurse Administrator 1 positions.  (Defs.' 56.1 ¶ 56; Butler Decl. ¶ 12; Moon Decl. ¶ 14; Tousignant Decl. ¶ 22.)  The selection committee considered the following factors:  the candidates' test scores, responses to questions during the interviews, experience working as a Nurse Administrator, experience working in specialty clinics, and experience with scheduling and other administrative tasks.  (Defs.' 56.1 ¶ 57; Butler Decl. ¶ 13; Moon Decl. ¶ 15; Tousignant Decl. ¶ 23.)  Butler, Moon, and Tousignant neither considered race or national origin in making their decisions, (Defs.' 56.1 ¶ 58; Butler Decl. ¶ 14; Moon Decl. ¶ 16; Tousignant Decl. ¶ 24), nor referred to any candidate's race or national origin during their deliberations for the vacant positions, (Defs.' 56.1 ¶ 59; Moon Decl. ¶ 14).[5]  To the extent that an interviewee chose to notify the selection committee of any other languages that he or she spoke, Butler, Moon, and Tousignant considered that to be a strength of the candidate because English is not the native language of some inmates at Fishkill.  (Defs.' 56.1 ¶ 60; Butler Decl. ¶ 15; Moon Decl. ¶ 17; Tousignant Decl. ¶ 25.)

After discussing the qualifications of the candidates, the selection committee ultimately recommended Jon Hansen ("Hansen") for the day-shift vacancy.  (Defs.' 56.1 ¶ 61; Bauer Decl. ¶ 23; Butler Decl. ¶ 16; Moon Decl. ¶ 18; Tousignant Decl. ¶ 26.)  Hansen, with a test score of

---

[5] Plaintiff broadly acclaims, without citation, that "[t]here is evidence demonstrating discrimination by those involved in the promotion decision, or that [his] race or national origin was a factor in the decision."  (Pl.'s Opp'n 7.)  He does not, however, provide any evidence in support of this declaration, and his unsupported assertion cannot place this issue in dispute.  *See Alzawahra v. Albany Med. Ctr.*, No. 11-CV-227, 2012 WL 5386565, at *1 (N.D.N.Y. Nov. 1, 2012) ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials asserted in the pleadings, or on conclusory allegations or unsubstantiated speculation." (citation and internal quotation marks omitted)), *aff'd*, 546 F. App'x 53 (2d Cir. 2013).

80, was tied with another candidate as having the second-highest score among the day shift applicants and, therefore, was reachable for that Nurse Administrator 1 position.  (Defs.' 56.1 ¶ 62; Bauer Decl. ¶ 25; *id.* Ex. C (Appointment Approval Requests).)  In addition, Hansen had extensive nursing experience, both as a Registered Professional Nurse and as an Emergency Medical Technician, in addition to computer software skills that would be relevant to the administrative duties of Nurse Administrator 1.  (Defs.' 56.1 ¶ 63; Butler Decl. ¶ 17; Moon Decl. ¶ 19; Tousignant Decl. ¶ 27; Bauer Decl. Ex. B (Resume of Jon Hansen).)  Plaintiff, with a score of 75, was not one of the three highest-scoring applicants for the day-shift position, and thus he was not reachable.  (Defs.' 56.1 ¶ 64; Bauer Decl. ¶ 25; *id.* Ex. C (indicating that Plaintiff had a "Score Not Reachable" for the day shift).)

Butler, Moon, and Tousignant recommended Colleen Bennett ("Bennett") for the night-shift vacancy.  (Defs.' 56.1 ¶ 65; Bauer Decl. ¶ 23; Butler Decl. ¶ 16; Moon Decl. ¶ 18; Tousignant Decl. ¶ 26.)  The selection committee considered her to be best suited for the position.  (Defs.' 56.1 ¶ 66; Butler Decl. ¶ 18; Moon Decl. ¶ 20; Tousignant Decl. ¶ 28.)  Bennett had been a nurse with DOCCS since 1989, and she had been working at Fishkill's RMU since 2001.  (Defs.' 56.1 ¶ 67; Butler Decl. ¶ 18; Moon Decl. ¶ 20; Tousignant Decl. ¶ 28; Bauer Decl. Ex. D (Resume of Colleen Bennett).)  During her time at Fishkill, Bennett had demonstrated a familiarity with and proficiency in the skills required by the particular challenges and responsibilities at the RMU.  (Defs.' 56.1 ¶¶ 68–69; Butler Decl. ¶¶ 18–19; Moon Decl. ¶¶ 20–21; Tousignant Decl. ¶ 28.)  She additionally impressed the selection committee with her preparation and professionalism.  (Defs.' 56.1 ¶ 70; Butler Decl. ¶ 18; Moon Decl. ¶ 20; Tousignant Decl. ¶ 28.)  Plaintiff was reachable for the night-shift vacancy because his test score was among the top three scores; the highest score was 85, while Plaintiff, Bennett, and another

candidate tied for second place with a score of 75.  (Defs.' 56.1 ¶¶ 71–72; Bauer Decl. ¶ 26; *id.*

Ex. C (Appointment Approval Requests).)  Plaintiff was the selection committee's second choice

for the night shift.  (Defs.' 56.1 ¶ 73; Bauer Decl. ¶ 23; Butler Decl. ¶ 20; Moon Decl. ¶ 22;

Tousignant Decl. ¶ 29.)

      After receiving the recommendations for the day-shift and night-shift vacancies, Bauer

confirmed that Hansen and Bennett were both reachable for the respective shifts.  (Defs.' 56.1

¶ 74; Bauer Decl. ¶¶ 24–26.)  She next communicated the selection committee's preferences to

the Diversity Management Office for approval.  (Defs.' 56.1 ¶ 75; Bauer Decl. ¶ 27.)  Bauer

received approval with respect to the day-shift vacancy on November 2, 2012 and approval with

respect to the night-shift vacancy on November 21, 2012.  (Defs.' 56.1 ¶ 76; Bauer Decl. ¶ 27.)

Bauer then compiled and sent the hiring packets to DOCCS's central office.  (Defs.' 56.1 ¶ 77;

Bauer Decl. ¶ 27.) [6]  DOCCS approved the offers of promotion for the day-shift and night-shift

vacancies on or around November 20, 2012 and on or around December 21, 2012, respectively.

(Defs.' 56.1 ¶ 78; Bauer Decl. ¶ 28.)  Hansen and Bennett both accepted the promotions.  (Defs.'

56.1 ¶ 79; Bauer Decl. ¶ 29.)  Had Bennett declined the offer, the night-shift position would have

been offered to Plaintiff.  (Defs.' 56.1 ¶ 80; Bauer Decl. ¶ 29.)

B.  Procedural Background

      Plaintiff commenced the instant Action on October 15, 2013, alleging DOCCS, Fishkill,

Anthony J. Annucci, William J. Connolly, Butler, and Moon violated Title VII in failing to

---

     [6] After Fishkill forwarded its recommendations to DOCCS's central office, the Diversity
Management Office contacted Bauer asking for "further justification [regarding the selection of
Bennett] because [Plaintiff] has been interviewed twice for the position and has not been
selected."  (Pl.'s Aff. Ex. 4 (emails between Bauer and Diversity Management Office).)  The
Diversity Management Office subsequently authorized the selection of Bennett for the night-shift
vacancy.  (Defs.' 56.1 ¶ 78; Bauer Decl. ¶ 28.)

promote him.  (Dkt. No. 1.)  Pursuant to a stipulation between the Parties, the four individual

defendants were dismissed from the Action on April 25, 2014.  (Dkt. No. 10.)  On May 19, 2014,

DOCCS and Fishkill submitted their Answer to the Complaint.  (Dkt. No. 14.)

Pursuant to a scheduling order adopted by the Court on March 6, 2015, (Dkt. No. 41),

Defendants filed their Motion and accompanying papers on May 5, 2015, (Dkt. No. 42–50).

Plaintiff filed an unsworn affidavit, his Affirmation in Opposition to the Motion, and

accompanying papers on June 3, 2015.  (Dkt. Nos. 51–56.)  Defendants filed their reply on June

18, 2015.  (Dkt. No. 57.)

## II.  Discussion

### A.  Materials Considered in Deciding this Motion

When ruling on a motion for summary judgment, a district court should only consider

evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am.,*

*Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish

facts, the statements 'must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant . . . is competent to testify on the matters

stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4))

(citing Fed. R. Evid. 602)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d

Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits

based on personal knowledge."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419–20, 421 (S.D.N.Y.

2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty*

*v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for

admissibility is whether a reasonable trier of fact could believe the witness had personal

knowledge." (internal quotation marks omitted)); *Zigmund v. Foster*, 106 F. Supp. 2d 353, 356

(D. Conn. 2000) (noting that "[a]n affidavit in which the plaintiff merely restates the conclusory allegations of the complaint" is insufficient to support a motion for summary judgment).

Furthermore, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome . . . a motion for summary judgment." *Perez v. de la Cruz*, No. 09-CV-264, 2013 WL 2641432, at *7 (S.D.N.Y. June 12, 2013) (italics and internal quotation marks omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation."). The Court, therefore, disregards assertions in Plaintiff's opposition papers that are not supported by admissible evidence. *See Mitchell v. Igoe*, No. 06-CV-186, 2009 WL 3165659, at *8 (N.D.N.Y. Sept. 25, 2009) ("Statements contained within a memorandum . . . without proper evidentiary support, do not constitute competent evidence upon which a court may base its ruling upon a motion for summary judgment." (citing *Commerce & Indus. Ins. Co. v. Vulcraft, Inc.*, No. 97-CV-2578, 1998 WL 823055, *11 (S.D.N.Y. Nov. 20, 1998)), *aff'd*, 407 F. App'x 536 (2d Cir. 2011); *Caracciola v. City of N.Y.*, No. 95-CV-3896, 1999 WL 144481, at *4 (S.D.N.Y. Mar. 17, 1999) (noting that neither the plaintiffs' "three-page memorandum of law [nor] their attorney's affirmation . . . constitutes admissible evidence as contemplated by Fed. R. Civ. P. 56(e)").

B.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

13

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of N.Y.*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks removed) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *see also Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), whereby a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (italics and internal quotation marks omitted).

## C.  Analysis

Plaintiff claims that Defendants, in failing to promote him to one of the two Nurse Administrator 1 positions, discriminated against him on the basis of race.  (*See* Compl. 2–3 (Dkt. No. 1).)[7]

To establish a claim of race or national origin discrimination under Title VII, a plaintiff must meet the burden of proving that the adverse employment decision was motivated, at least in

---

[7] Because Plaintiff attached unnumbered type-written pages to his standard-form Complaint, the Court will cite to the ECF page number electronically stamped on the top of each page.

part, by the "impermissible reason" of race or national origin.  *See Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997).  Courts analyze such claims under the familiar three-part framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (applying burden-shifting in Title VII context).  First, a plaintiff must establish a prima facie case of discrimination.  *Id.*  The plaintiff's burden at this stage is minimal.  *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001).  If the plaintiff satisfies his initial burden, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action.  *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004).  "If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"  *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

    1.  Plaintiff's Prima Facie Case

        In order to establish a prima facie case of discrimination based on discrete adverse employment actions, a plaintiff must introduce evidence showing that:  (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Holcomb*, 521 F.3d at 138; *see also Bryant v. Verizon Commc'ns, Inc.*, 550 F. Supp. 2d 513, 534 (S.D.N.Y. 2008) (same).

        Here, there is no dispute that Plaintiff, who identifies as Vietnamese, (*see* Compl. 7; Pl.'s Opp'n 2), is a member of a protected class under Title VII, *see Krishnapillai v. Donahoe,* No. 09-CV-1022, 2013 WL 5423724, at *9 (E.D.N.Y. Sept. 26, 2013) (determining that the

"[p]laintiff is a member of protected classes under Title VII due to his race (Asian) and national

origin (Indian)"); *Rajaravivarma v. Bd. of Trs.  for Conn. State Univ. Sys.*, 862 F. Supp. 2d 127,

148 (D. Conn. 2012) (finding it undisputed that a foreign-born plaintiff is a member of a

protected class for purposes of a race and national origin claim).  It is also undisputed that

Defendants did not promote Plaintiff to one of two Nurse Administrator 1 vacancies at Fishkill,

(*See* Defs.' 56.1 ¶¶ 61, 65; Pl.'s Aff. ¶ 1), which constitutes an adverse employment action, *see*

*Sethi v. Narod*, 12 F. Supp. 3d 505, 525 (E.D.N.Y. 2014).  Accordingly, the Court's inquiry

focuses on whether Plaintiff has presented evidence to support the two remaining elements

necessary to establish a prima facie case of discrimination.

       a.  Qualification

       Under the *McDonnell-Douglas* framework, a "plaintiff must prove by a preponderance of

the evidence that [he] applied for an available position for which [he] was qualified."  *Burdine*,

450 U.S. at 253.  Where a plaintiff cannot show that he was eligible for the position sought, he

fails to make a prima facie case under Title VII.  *See, e.g.*, *Workneh v. Pall Corp.*, 897 F. Supp.

2d 121, 131 (E.D.N.Y. 2012) (dismissing the plaintiff's failure-to-promote claim "because he has

not met his prima facie burden of establishing he was qualified for [the relevant] position"

(italics omitted)); *Velez v. SES Operating Corp.*, No. 07-CV-10946, 2009 WL 3817461, at *8

(S.D.N.Y. Nov. 12, 2009) (explaining that "the plaintiff [must] establish basic eligibility for the

position at issue" in order to make out a prima facie case of discrimination (internal quotation

marks omitted) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir.

2001))); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 369 (S.D.N.Y. 2008)

(holding the "[p]laintiff fail[ed] to make a prima facie case that [the] [d]efendant's failure to

promote [him] was discriminatory," where the plaintiff failed to that show he was qualified for

the relevant position); *Williams v. R.H. Donnelley Inc.*, 199 F. Supp. 2d 172, 177 (S.D.N.Y. 2002) (finding that "summary judgment on behalf of [the] defendant is appropriate" where the plaintiff "was not qualified for the promotion"), *aff'd*, 368 F.3d 123 (2d Cir. 2004).

"[B]eing 'qualified' refers to the criteria the employer has specified for the positions," *Workneh*, 897 F. Supp. 2d at 131 (some internal quotation marks omitted) (citing *Williams*, 368 F.3d at 127), which as relevant here mandate that a candidate with a score below those of the three highest-scoring applicants cannot be selected as long as one of the top three scorers accepts the position, (Defs.' 56.1 ¶ 26; Bauer Decl. ¶ 8). Because Plaintiff's civil service exam score (unlike Hansen's) was not among the top three scores of those applying for the day-shift vacancy, Plaintiff was not reachable—that is, not qualified—for the position (whereas Hansen and two other candidates were). (Defs.' 56.1 ¶¶ 62, 64; Bauer Decl. ¶ 25; *id.* Ex. C.)[8] Plaintiff thus cannot establish a prima facie case of discrimination with respect to the day shift. *See Orlando v. Dep't of Transp., Comm'r*, 459 F. App'x 8, 9 (2d Cir. 2012) (concluding that the "failure to promote [the plaintiff] cannot support a prima facie discrimination finding because he failed the test that was administered for the promotion" and thus "was not qualified for the position" (italics omitted)).[9]

---

[8] Indeed, because Hansen and two other candidates were qualified for the day-shift position, DOCCS could not even extend an offer to Plaintiff unless none of those top three scorers accepted the position. (Defs.' 56.1 ¶ 26; Bauer Decl. ¶ 8.)

[9] In any event, Plaintiff has failed to respond to Defendants' argument that he was not eligible for the day-shift position. (*See* Pl.'s Opp'n 5–7 (asserting he has established the second element of a prima facie case with respect to the night-shift position but making no specific allegation as to the day shift)). The Court accordingly deems this claim abandoned, *see Lipton v. Cty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (affirming that a "[c]ourt may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed"); *accord Cruz v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, No. 13-CV-1335, 2014 WL 2547541, at *7 (S.D.N.Y. June 4, 2014) (deeming a

b.  Inference of Discrimination

Plaintiff also fails to establish the fourth element of a prima facie case with respect to either the day-shift or night-shift vacancy, as he presents no evidence of circumstances giving rise to an inference of discrimination.

"[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996).  A plaintiff can support such an inference by (a) "demonstrating that similarly situated employees of a different race or national origin were treated more favorably," (b) "showing that there were remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," or (c) "proving that there were other circumstances giving rise to an inference of discrimination on the basis of [the] plaintiff's race or national origin." *Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *15 (S.D.N.Y. Mar. 26, 2009) (citations and internal quotation marks omitted), *aff'd*, 376 F. App'x 127 (2d Cir. 2010).  Conclusory and speculative allegations will not suffice to demonstrate discriminatory intent.  Rather, a plaintiff "must point to facts that suggest" that the adverse employment action was motivated, at least in part, by discriminatory animus.  *Kalsi v. N.Y.C. Transit Auth.*, 62 F. Supp. 2d 745, 753 (E.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (reaffirming that, in order to prove a case of discrimination, a plaintiff "may not rely simply on conclusory statements"); *Anderson v. Port Auth.*, No. 04-CV-4331, 2009 WL 102211, at *4 (S.D.N.Y. Jan. 12, 2009) ("[M]ere conclusory allegations of discrimination will not defeat a summary judgment motion; a

---

claim abandoned where the "[p]laintiff declined to respond to [the] [d]efendant's argument"), even as, for the sake of thoroughness, it has addressed the merits.

plaintiff in a discrimination case must proffer 'concrete particulars' to substantiate his claim."). Though "the burden of meeting the prima facie case is 'de minimis,'" a "[p]laintiff must adduce some admissible evidence that would support his claims." *Henny v. N.Y. State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (alterations and internal quotation marks omitted).

To begin, the only alleged "remarks" relating to Plaintiff's race or national origin concern the mentions of Vietnamese language and Vietnamese cooking during his interview. (*See* Compl. 16; Pl.'s Aff. ¶ 9; Pl.'s Opp'n 3.) Plaintiff stated in his deposition that he did not remember how those topics were introduced, who first raised those topics, or what specifically was said. (Pl.'s Dep. 32:5–8, 33:3–16, 34:5–7, 34:25–35:6, 36:6–9, 36:17–23, 38:1–3, 39:15–17, 43:12–24, 44:2–8; *see also* Pl.'s Aff. ¶ 9.)[10] Tousignant, on the other hand, avers that *Plaintiff*

---

[10] In his opposition papers, Plaintiff claims that Tousignant and Moon asked him about his country of birth, what languages he speaks (and whether he speaks Spanish), about his favorite Vietnamese food, and whether he went to school in America or Vietnam. (Pl.'s Aff. ¶ 9; *see also* Pl.'s Opp'n 3.) These assertions, however, directly contradict Plaintiff's prior sworn testimony that he did not recall specific questions asked during the interview. (Pl.'s Dep. 32:5– 8, 33:3–16, 34:5–7, 34:25–35:6, 36:6–9, 36:17–23, 38:1–3, 39:15–17, 43:12–24, 44:2–8.) Because "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony," *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996), the Court need not credit the inconsistent portion of his affidavit, *see Jeffrey v. Montefiore Med. Ctr.*, No. 11-CV-6400, 2013 WL 5434635, at *15 (S.D.N.Y. Sept. 27, 2013) (citing *Hayes* and "declin[ing] to consider the inconsistent portions of [the] [p]laintiff's [d]eclaration in adjudicating [the defendant's] motion"); *Golden v. Merrill Lynch & Co., Inc.*, No. 06-CV-2970, 2007 WL 4299443, at *12 (S.D.N.Y. Dec. 6, 2007) (noting that "the portions of [the plaintiff's] affidavit which conflict with her deposition will be disregarded"). Yet, even were the Court to accept Plaintiff's new assertion regarding the substance of the interview, "[s]tatements and questions acknowledging [a] plaintiff's national origin and background do not support an inference of discriminatory animus." *Chudnovsky v. Prudential Sec., Inc.*, No. 98-CV-7753, 2000 WL 1576876, at *8 (S.D.N.Y. Oct. 23, 2000), *aff'd*, 51 F. App'x 901 (2d Cir. 2002); *see also Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 285 (S.D.N.Y. 1999) ("[C]omments acknowledging a plaintiff's protected status, which do not provide some indication of disapproval of the plaintiff's membership in such class, fail to demonstrate bias."), *aff'd*, 205 F.3d 1327 (2d Cir. 2000); *Jalal v. Columbia Univ. in City of N.Y.*, 4 F. Supp. 2d 224, 236 (S.D.N.Y. 1998) ("Statements that merely acknowledge a person's membership in a Title VII-protected class . . . fail to demonstrate bias.").

volunteered the information regarding his Vietnamese language skills and his interest in Vietnamese cooking in response to general questions posed by the selection committee. (Tousignant Decl. ¶¶ 18–19.)  Regardless, such discussion, on its own, fails to reflect any discriminatory animus on the part of interviewers.  *See Pasha v. William M. Mercer Consulting, Inc.*, No. 00-CV-8362, 2004 WL 188077, at *4 (S.D.N.Y. Feb. 2, 2004) (finding the plaintiff failed to establish discrimination where his country of origin "came up 'perfectly natural[ly]'" during an interview), *aff'd*, 135 F. App'x 489 (2d Cir. 2005); *Pasic v. Eztzi's Tex. Holding Corp.*, No. 01-CV-1114, 2002 WL 31938854, at *3 (S.D.N.Y. Jan. 9, 2002) ("The mere fact that [an interviewer] discussed [the] plaintiff's national origin and religion while interviewing [the] plaintiff does not indicate that [the defendant] discriminated against [the] plaintiff since Title VII does not bar all discussion of religion and/or national origin in an employment setting.").[11] Simply put, Plaintiff cannot make out a prima facie case based on questions related to his race or national origin that provide no inference of discrimination, especially considering Plaintiff himself raised those subjects.

Second, Plaintiff repeatedly underscores that Butler did not participate in his interview but was present for the interviews of the other candidates, including Hansen and Bennett.  (*See* Compl. 16; Pl.'s Aff. ¶¶ 13, 26–29; Pl.'s Opp'n 3, 6.)  He does not, however, satisfactorily explain how her absence gives rise to any inference of discrimination.  Plaintiff asserts that Butler "chose" not to participate in his October 10 interview, (*see* Compl. 16; Pl.'s Opp'n 3), but the undisputed evidence shows that she was called away in order to address an urgent matter at

---

[11] Far from reflecting any animus, the discussion of language seems to have weighed *in favor* of Plaintiff's candidacy, given that the selection committee considered foreign language skills to be an advantage for the position.  (Defs.' 56.1 ¶ 60; Butler Decl. ¶ 15; Moon Decl. ¶ 17; Tousignant Decl. ¶ 25.)

the facility, (Butler Decl. ¶ 10; Moon Decl. ¶ 8; Tousignant Decl. ¶ 16).  Not only has Plaintiff

expressly declined to dispute this fact, (*see* Pl.'s Dep. 130:23–131:14; Pl.'s Opp'n 2), but he

actually substantiates the testimony of the selection committee in recalling that he saw "a woman

talking on the phone and yelling into the hallway looking for somebody" just prior to his

interview, (Pl.'s Aff. ¶ 6; *see also id.* ¶ 10 (acknowledging Butler as the woman he had seen

outside the interview room)).  He thus fails to demonstrate that Butler's non-participation was

voluntary, let alone in any way connected to his race or national origin.  Though Plaintiff notes

Butler participated in other applicants' interviews, including those "for [the] two promoted white

candidates," (Pl.'s Opp'n 3), his bare suspicions of discrimination in the absence of any

supporting evidence will not suffice, *see Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir.

1999) (finding "[the plaintiff's] feelings and perceptions of being discriminated against are not

evidence of discrimination" (brackets and internal quotation marks omitted)); *Garcia v. Henry

St. Settlement*, 501 F. Supp. 2d 531, 541 (S.D.N.Y. 2007) ("Speculation, conjecture and guess-

work cannot substitute for actual evidence of discrimination."); *Williams v. All. Nat'l Inc.*, No.

98-CV-7984, 2001 WL 274107, at *5 (S.D.N.Y. Mar. 19, 2001) (noting that a plaintiff's "beliefs

cannot replace the 'admissible evidence' required to permit an inference of discrimination and

survive summary judgment"), *aff'd*, 24 F. App'x 50 (2d Cir. 2001).

Separately, Plaintiff contends that Butler's absence from his interview violated DOCCS's

hiring policies and procedures.  (*See* Compl. 7–8; Pl.'s Opp'n 6.)  As the only evidence in

support of this argument, Plaintiff points to a memorandum from December 2013—over a year

*after* Plaintiff's interview—stating that four individuals, including the Facility Health Services

Director, must participate in the interviews for Nurse Administrator positions.  (Pl.'s Aff. Ex. 7.)

Though Plaintiff claims that this document "existed before October 10, 2012," he identifies no

22

factual basis for this assertion.  (Pl.'s Opp'n 3.)  Defendants, on the other hand, provide four

sworn statements that as of October 2012, no DOCCS policy required that all interviews be

conducted by at least three individuals and/or that the Deputy Superintendent of Health

participate in all interviews.  (Bauer Decl. ¶ 12; Butler Decl. ¶¶ 11–12; Moon Decl. ¶ 9;

Tousignant Decl. ¶ 17.)  Even had such a rule existed at the time of Plaintiff's interview, the

Court cannot contemplate how a violation of this rule would implicate Plaintiff's race or national

origin, and Plaintiff provides no evidence to shed light on that question.  *See Whaley v. City*

*Univ. of N.Y.*, 555 F. Supp. 2d 381, 402 (S.D.N.Y. 2008) (finding the defendants were entitled to

summary judgment on Title VII discrimination claim where "no evidence support[ed] any

finding of discriminatory animus"); *Garvin v. Potter*, 367 F. Supp. 2d 548, 565–66 (S.D.N.Y.

2005) (dismissing Title VII claim where the plaintiff failed to provide evidence suggesting that

discriminatory animus motivated factor in the defendant's actions).

Third, Plaintiff maintains that he was more qualified for the Nurse Administrator 1

position than Bennett.  (*See* Compl. 8; Pl.'s Opp'n 4.)  Yet, a plaintiff's "opinion about his own

qualifications does not suffice to give rise to an issue of fact about whether he was discriminated

against, and that is particularly true where the employer's decision whether to promote [the

employee] did not depend simply on whether he was qualified, but on whether he was the best

candidate for the job."  *Hines v. Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 320 (W.D.N.Y.

1999) (alterations and internal quotation marks omitted).  Plaintiff may disagree with the

determination that Hansen and Bennett were best suited for the respective positions, but as a

matter of law his subjective assessment cannot give rise to an inference of discrimination.  *See*

*Crews v. Trs. of Columbia Univ. in City of N.Y.*, 452 F. Supp. 2d 504, 526 (S.D.N.Y. 2006)

("Although [the plaintiff] may disagree with [the defendant's] determination that [another

candidate] was more qualified than he, courts are not permitted to second-guess the reasonableness of the employer's criteria for employment or the merits of its selection for the position."). Indeed, where a decision to promote one person rather than another "is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001); *see also Sibilla v. Follett Corp.*, No. 10-CV-1457, 2012 WL 1077655, at *15 (E.D.N.Y. Mar. 30, 2012) (same).

Lastly, in his opposition papers, Plaintiff contests the propriety of the selection process for the night-shift vacancy. (*See* Pl.'s Aff. ¶¶ 30–31; Pl.'s Opp'n 3–6.) Plaintiff first claims that Defendants "[p]re-selected non-minority candidate . . . Bennett" for the position by assigning her Nurse Administrator 1 duties "before and after the interview on October 10, 2012." (Pl.'s Opp'n 6.) Curiously, the document he cites in support of this contention merely indicates Bennett performed such duties prior to her interview. (*See* Pl.'s Aff. Ex. 16 (Email from Moon to Bauer (Nov. 29, 2012)).)[12] Plaintiff provides no evidence that Bennett had been *selected* for the night shift prior to her October 10 interview; in fact, he appends documents suggesting the selection took place on or around November 1, 2012. (*See, e.g.*, Pl.'s Opp'n 3 (citing Pl.'s Aff. Ex. 24 (Letter from Bauer to DOCCS List Unit (Nov. 1, 2012)).) By contrast, Butler, Moon, and Tousignant aver not only that the selection occurred after the October 10 interviews but also that they considered Bennett's performance during her interview in making their recommendation. (Butler Decl. ¶¶ 12–13, 18–19; Moon Decl. ¶¶ 14–15, 20–21; Tousignant Decl. ¶¶ 22–23, 28; *cf.* Pl.'s Aff. Ex. 20 ("Office of Diversity Management Checklist" (Oct. 18, 2012)).) Plaintiff's

---

[12] In explaining her selection preference, Moon noted that Bennett "ha[d] recently been acting in the capacity as a nurse administrator." (Pl.'s Aff. Ex. 16.)

conclusory—and overwhelmingly controverted—assertion of "pre-selection" falls far short of demonstrating discriminatory intent.

Plaintiff further claims the hiring decision occurred before the selection committee had completed "the entire interview process, ending on November 2, 2012." (Pl.'s Opp'n 4.) Yet, as noted above, the additional applicants interviewed on October 31, 2012 and November 2, 2012 were not reachable for the night-shift vacancy, based on their scores. (Bauer Decl. ¶ 22.) This meant that no other eligible candidates were scheduled to be interviewed after October 10. (Bauer Decl. ¶¶ 25–26.) Thus, the Court can find no impropriety, let alone discriminatory animus, in the timing of the selection committee's recommendation of Bennett.

Plaintiff also points to an inquiry from the Diversity Management Office for "more substantial justification" as to why Plaintiff was not selected for the promotion and alleges that these "concerns infer a possibility of discrimination." (Pl.'s Opp'n 2–3 (citing Pl.'s Aff. Ex. 4 (Emails between Bauer and Diversity Management Office)).) Yet, not only does Plaintiff fail to cite evidence suggesting that the request for information was not satisfied, but he actually has submitted documents indicating just the opposite. (*See, e.g.*, *id.* Ex. 16 (Email from Moon to Bauer (Nov. 29, 2012)).)[13] Moreover, Plaintiff concedes that the Diversity Management Office expressly authorized the selection of Bennett for the night-shift vacancy within a month of that inquiry. (Pl.'s Opp'n 2; *cf.* Defs.' 56.1 ¶ 78.) Therefore, there is no inference of discrimination based on the Diversity Management Office's involvement.[14]

---

[13] In her email to Bauer, Moon explained that "Bennett presented herself very professionally and answered the questions asked more comprehensibly and in depth." (Pl.'s Aff. Ex. 16.) She further noted that Bennett "presented herself with a comprehensive knowledge of the role of a Nurse Administrator and having broad knowledge of the RMU . . . ." (*Id.*)

[14] While Plaintiff believes that the Diversity Management Office "should have requested and reviewed [his] qualifications and experiences before [it] approved or agree with [the

On the whole, Plaintiff has provided no concrete evidence of circumstances giving rise to an inference of discrimination.  His failure-to-promote claim ultimately rests on "nothing more than his own subjective belief that he was discriminated against, which is not enough to make out a prima facie discrimination case under Title VII." *Gibbs v. Metro. Transp. Auth.*, No. 13-CV-1583, 2014 WL 5842833, at *5 (E.D.N.Y. Nov. 12, 2014); *see also White v. Fuji Photo Film USA, Inc.*, 434 F. Supp. 2d 144, 151 (S.D.N.Y. 2006) ("Courts within the Second Circuit have not hesitated to grant defendants summary judgment in such case[s] where [a] plaintiff has offered little or no evidence of discrimination." (internal quotation marks omitted)).

    2.  Defendant's Non-Discriminatory Reasons

Even assuming that Plaintiff could make out a prima facie case of discrimination, Defendants have provided legitimate, non-discriminatory reasons for promoting Hansen and Bennett rather than Plaintiff.

At this second stage of the *McDonnell-Douglas* framework, an employer's burden is to "clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (italics and internal quotation marks omitted); *see also McCaskill v. ShopRite Supermarket*, No. 13-CV-238, 2015 WL 419658, at *8 (N.D.N.Y. Jan. 30, 2015) (same).  This "burden of showing a legitimate[,] non-discriminatory reason for its actions is not a particularly steep hurdle." *Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005).  Defendants here have met their burden.

---

selection committee's recommendations]," (Pl.'s Opp'n 3; *see also* Pl.'s Aff. ¶ 40), that opinion adds nothing to his Title VII claim.

For one, as noted, DOCCS could not have hired Plaintiff for the day-shift vacancy because he was not reachable for that position based on his civil service exam score. (Bauer Decl. ¶ 25.) Moreover, in their sworn statements, Butler, Moon, and Tousignant note Hansen's extensive experience as a Registered Professional Nurse and Emergency Medical Technician in addition to his computer software skills. (Butler Decl. ¶ 17; Moon Decl. ¶ 19; Tousignant Decl. ¶ 27.) With respect to the night-shift vacancy, the members of the selection committee pointed to Bennett's years of experience, professionalism during the interview, and demonstrated familiarity with and proficiency in the skills required of RMU staff. (Butler Decl. ¶ 18; Moon Decl. ¶ 20; Tousignant Decl. ¶ 28.)[15]

Defendants, therefore, have sustained their burden of providing non-discriminatory reasons—namely, Hansen's and Bennett's civil service exam scores, performance during the job interviews, qualifications, and experience—for not promoting Plaintiff. *See Jimenez v. City of N.Y.*, 605 F. Supp. 2d 485, 524–25 (S.D.N.Y. 2009) (noting that "employers enjoy unfettered discretion to choose among qualified candidates and to decide which types of credentials are of the most importance for a particular job" (internal quotation marks omitted)); *cf. Schupbach v. Shinseki*, 905 F. Supp. 2d 422, 436 (E.D.N.Y. 2012) (concluding an employer "proffered a legitimate, non-discriminatory reason for not selecting [the] plaintiff—namely, that that there were other candidates that were more qualified than [the] plaintiff"); *Milano v. Astrue*, No. 05-

---

[15] Plaintiff asserts, without citation, that he has greater "familiarity with supervising, scheduling, and handling emergency situations . . . ." (Pl.'s Opp'n 4.) A plaintiff who "seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer" must have "credentials . . . so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie*, 243 F.3d at 103 (internal quotation marks omitted). Clearly that is not the case here, where, for example, it is undisputed that since 2006 Plaintiff had been working at Downstate, (Defs.' 56.1 ¶ 15; Pl.'s Dep. 17:5–9, 107:10–11), which unlike Fishkill does not have an RMU, (Butler ¶ 19; Moon ¶ 21).

CV-6527, 2008 WL 4410131, at *30–31 (S.D.N.Y. Sept. 26, 2008) (finding that an employer

overcame a prima facie case by coming forward with evidence that certain chosen applicants had

prior experience and that the employer was concerned with the plaintiff's ability to handle

certain aspects of position), *aff'd* 382 F. App'x 4 (2d Cir. 2010).[16]  Although Plaintiff may

disagree with the decision that Hansen and Bennett were better suited for the Nurse

Administrator 1 positions, the "Court is not permitted to second-guess the wisdom of

[Defendants'] selection."  *Lanier v. I.B.M. Corp.*, 319 F. Supp. 2d 374, 387 (S.D.N.Y. 2004)

(internal quotation marks omitted).

### 3.  Pretext

Because Defendants have shown legitimate, non-discriminatory reasons for their hiring

decision, the burden returns to Plaintiff to come forward with evidence that the reasons cited are

"mere pretext for actual discrimination."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.

2000).  To meet this burden, which is "higher than that . . . applied for analyzing the prima facie

case," *Geoghan v. Long Is. R.R.*, No. 06-CV-1435, 2009 WL 982451, at *21 (E.D.N.Y. Apr. 9,

2009) (italics omitted), a "plaintiff must produce not simply 'some' evidence, but sufficient

evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered

by the defendant were false, and that more likely than not discrimination was the real reason for

the employment action," *Weinstock*, 224 F.3d at 42 (alterations and some internal quotation

---

[16] It bears noting that Defendants need not prove that either Hansen or Bennett "was actually the more qualified candidate" but "must only adduce proof that [their] selection was not based on discriminatory motive."  *Gomez v. Metro. Dist.*, 10 F. Supp. 3d 224, 242–43 (D. Conn. 2014); s*ee also Brierly*, 359 F. Supp. 2d at 296 ("The [d]efendants are not required to prove that [the selected candidate] was the superior candidate; they are only required to offer non-discriminatory explanations for how and why they chose her over [the plaintiff]."). Nevertheless, evidence that a more qualified candidate was selected for the open position, as offered by Defendants here, "rebuts any presumption of discrimination."  *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996).

marks omitted).  That evidence may be either direct or circumstantial, *Jimenez*, 605 F. Supp. 2d

at 522 (citing *Burdine*, 450 U.S. at 256)), but must, "taken as a whole, support[] a sufficient

rational inference of discrimination," *Weinstock*, 224 F.3d at 42.  "[I]t is not enough . . . to

disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of

intentional discrimination." *St. Mary's Honor Ctr.*, 509 U.S. at 519 (emphasis omitted).  That

the Court cannot do.

      Plaintiff offers insufficient evidence, if any evidence at all, to contest the qualifications of

either Hansen or Bennett.[17]  Indeed, he acknowledges that "Defendant[s] had legitimate reasons

for hiring [the former]," (Pl.'s Opp'n 4), and does not dispute that the latter had the same test

score as he, impressed the selection committee with her professionalism, and had considerable

experience at DOCCS, (*id.*).[18]  Rather, Plaintiff only contends that he had greater experience, or

"more seniority," than Bennett.  (*Id.*; *see also id.* 6–7.)  However, to repeat, this subjective belief

that he was more qualified for the position is insufficient to rebut Defendants' non-

discriminatory reasons for their employment action.  *See Holt*, 95 F.3d at 130 (reaffirming that a

---

[17] In his opposition papers, Plaintiff bizarrely "dispute[s] that the administrators did not
follow the [c]ivil [s]ervice interview rules and protocols" when they "used the score as the
determining factor."  (Pl.'s Opp'n 4.)  As an initial matter, the civil service rules *require* a
selected candidate to have one of the top three scores among the applicants for the position,
(Defs.' 56.1 ¶ 26; Bauer Decl. ¶ 8), which necessarily renders each candidate's score decisive in
the selection process.  Moreover, neither Hansen nor Bennett was the highest scorer in their
respective applicant groups, (Defs.' 56.1 ¶¶ 62, 71–72; Bauer Decl. ¶¶ 25–26; *id.* Ex. C
(Appointment Approval Requests)), but were recommended by the selection committee
nonetheless, (Defs.' 56.1 ¶¶ 61, 65; Bauer Decl. ¶ 23; Butler Decl. ¶ 16; Moon Decl. ¶ 18;
Tousignant Decl. ¶ 26).

[18] While Plaintiff alleges, without citation, that "[t]he reasons for hiring . . . Bennett were
not based on the performance, on the presentation during job interviews, or qualifications and
experience," (Pl.'s Opp'n 7), the Court disregards such unsubstantiated speculation in resolving
the instant Motion, *see Mitchell*, 2009 WL 3165659, at *8.  Similarly, the Court pays no heed to
the bare assertion that "the administrators involved in the selection did not carefully
consider . . . [P]laintiff and his qualifications."  (Pl.'s Opp'n 4.)

plaintiff cannot show pretext simply "by asserting her personal belief that she was the most qualified person for the various positions"); *Jones v. N.Y.C. Bd. of Educ.*, No. 09-CV-4815, 2012 WL 1116906, at *12 (S.D.N.Y. Apr. 2, 2012) ("The [p]laintiff's subjective belief that she was more qualified . . . is insufficient to establish pretext."); *Subramanian v. Prudential Sec., Inc.*, No. 01-CV-6500, 2003 WL 23340865, at *9 (E.D.N.Y. Nov. 20, 2003) ("[The plaintiff's] subjective belief that he was more qualified is insufficient to create a genuine issue of material fact as to whether he was the target of discrimination.").  Plaintiff's unsubstantiated self-assessment does not create a genuine issue of material fact on the issue of pretext.

In an attempt to provide circumstantial evidence of discrimination, Plaintiff contends that Defendants' selections for the Nurse Administrator 1 position reflect an "imbalance" between minority and non-minority candidates.  (Pl.'s Opp'n 3; *see also* Compl. 7 (alleging that few non-white applicants have been promoted to Nurse Administrator 1 positions at Fishkill).)  It bears noting, as an initial matter, that "statistical evidence of an employer's general hiring practices is insufficient to prove that a particular plaintiff was discriminated against."  *Zenni v. Hard Rock Cafe Int'l, Inc. (N.Y.)*, 903 F. Supp. 644, 654 (S.D.N.Y. 1995); *see also Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Statistics alone do not suffice to establish an individual disparate treatment claim for a very good reason:  the particular plaintiff must establish *he* was the victim of racial discrimination.").  Indeed, in this case, Plaintiff has failed to set forth any link between the failure to promote him and the allegedly discriminatory hiring practices of Defendants.  *See Hussey v. N.Y. State Dep't of Law/Office of Atty. Gen.*, 933 F. Supp. 2d 399, 408 (E.D.N.Y. 2013) (finding statistical evidence unavailing where the plaintiff "failed to set forth any link between the failure to promote her and the alleged discriminatory animus of the defendants").  For example, the statistics themselves do not give rise to an inference of discrimination because

Plaintiff has failed to present accurate and complete data on the racial or ethnic identities of individuals hired to the Nurse Administrator 1 position at Fishkill.[19]  As noted above, DOCCS does not require its employees to provide information about their racial or ethnic background. (Bauer Decl. ¶ 30.)  The Diversity Management Office records thus reflect that among employees in the Nurse Administrator 1 position at Fishkill in 2013, only one was known to be Caucasian while two were of unknown ethnicity; in 2014, only two were known to be Caucasian while two were of unknown ethnicity.  (Pl.'s Aff. Ex. 5.)  With respect to individuals in the Nurse Administrator 1 position across DOCCS generally, 26 of the 61 employees were of unknown ethnicity in 2013, and 25 of the 57 employees were of unknown ethnicity in 2014.  (*Id.* Ex. 6.)  Given the glaring gaps in the Diversity Management Office records cited by Plaintiff, this statistical information does little to salvage Plaintiff's unsubstantiated, and undefined, claim of "imbalance."[20]

Plaintiff has thus failed to produce evidence to create a genuine question of fact as to whether Defendants' explanation for their hiring decision is pretextual.[21]

---

[19] Previously, Plaintiff identified only two sources of information to support this allegation:  word of mouth from unidentified employees at Fishkill, (Pl.'s Dep. 75:19–76:14; *cf.* Defs.' 56.1 ¶ 82), and a civil service list of individuals eligible for the Nurse Administrator 1 position, which Plaintiff manually marked to indicate non-white candidates based on the individuals' names or physical appearance, (Pl.'s Dep. 77:5–20, 109:15–23, 110:22–112:16; *cf.* Defs.' 56.1 ¶¶ 82–83).  Neither is persuasive, given the obvious absence of any indicia of reliability.

[20] At no point does Plaintiff define the term "imbalance" as it pertains to Defendants' hiring practices.  (*See generally* Pl.'s Opp'n 4–5.)  He seems to suggest, in passing, that the promotions should reflect the prison population served by those in Nurse Administrator 1 positions, yet he provides no basis to support that assertion.  (*Id.* at 6.)

[21] Even if he had shown a basis on which a jury could reject Defendants' explanation, Plaintiff has completely failed to produce any evidence, apart from his own speculation, that Defendants acted in a discriminatory fashion based on his race or national origin.  No evidence whatsoever suggests that race or national origin played any role in the selection committee's

III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. The

Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 42), enter

judgment for Defendants, and close this case.

SO ORDERED.
Dated:        March _ll_, 2016
                White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

recommendations. Indeed, in alleging that "[D]efendant[s] had pretext to select [Bennett]
because she worked for . . . [D]efendant[s] at Fishkill," (Pl.'s Opp'n 4), Plaintiff himself appears
to admit as much, *see Hussey*, 933 F. Supp. 2d at 407–08 (finding that the "plaintiff wholly
undermines the plausibility of her discrimination claim" where her "allegations suggest
favoritism toward [the selected candidate], not racial discrimination against [the] plaintiff");
*Rolle v. Educ. Bus Transp., Inc.*, No. 11-CV-3855, 2013 WL 783026, at *13 (E.D.N.Y. Feb. 12,
2013) (dismissing a discrimination claim when the plaintiff's own complaint "suggest[ed] . . .
that [the defendant's agent] was motivated by a personal dislike, rather than unlawful bias"),
*adopted by* 2013 WL 783011 (E.D.N.Y. Feb. 27, 2013).